## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE:<br><br>BLESSING INDUSTRIES<br> PRAIRIELAND, LLC,<br><br>    Debtor. | Chapter 11<br><br>Case No. 15-00365<br><br><br>MOTION FOR AUTHORITY TO SELL<br>ASSETS FREE AND CLEAR OF LIENS |

COMES NOW Blessing Industries Prairieland, LLC (the "Debtor") through its undersigned counsel, and hereby requests the Court enter an Order Granting the Debtor's Motion for Authority to Sell Assets Free and Clear of Liens, and in support thereof states as follows:

### Jurisdiction and Venue

1. The Debtor is an Iowa Limited Liability Company conducting its metal fabrication business in Fayette and Buchanan Counties, Iowa, which filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Iowa on March 25, 2015.

2. The Court has jurisdiction over this matter pursuant to 28 U.C.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b).

3. The Debtor was formed as an Iowa Limited Liability Company on October 13, 2014 for the purpose of purchasing the Blessing Industries companies from Decker Acquisitions. The Debtor operates the metal fabrication business that had been purchased from Decker Acquisitions in October of 2014.

4. The Debtor is an affiliate of Prairieland Blessing Properties, LLC, an Iowa Limited Liability Company formed on October 13, 2014 for the purpose of owning the land and buildings upon which the metal fabrication operations are carried out.

5. Decker Acquisitions purchased the assets of Blessing Industries that operated in Fayette and Oelwein, Iowa through a bankruptcy court auction in the spring of 2000. Decker Acquisitions operated the plants that it purchased in Fayette and Oelwein, Iowa along with its plant in Quasqueton, IA until the sale in late October of 2014. Accordingly, venue is proper in this district pursuant to 28 U.S.C. § 1408.

**Background**

6. The Debtor operates a custom metal fabrication shop building upon the work that was begun by its founder, Blaine Blessing, in 1989. It provides precision metal fabrication solutions for original equipment manufacturers. It provides metal solutions for industries involved with construction, agriculture, transportation, pharmaceutical, and aerospace.

7. The Debtor performs the numerous processes on various metals for its customers including CNC laser cutting; machining centers; turret punches; press brakes; metal shaping; plasma cutting; welding; bending; cutting; shearing; finishing; painting; and, preparation of surfaces for finishing.

8. Shortly after the acquisition in October of 2014, the new owners began to experience problems with their cash flow numbers as there was increased overhead that made it impossible for the business to thrive on sales of $600,000 per month, the prior break-even price. By the end of February of 2015, it became apparent that the company would not have sufficient resources to continue operations.

**Proposed Sale of Substantially All of Debtor's Assets
Outside of the Ordinary Course of Business**

9. The Debtor intends to sell substantially all of its assets outside of the ordinary course of business, free and clear of liens, claims, interests and encumbrances to a successful

bidder that makes a reasonable offer for the Debtor's assets, so long as such bidder's offer is in the best interests of the bankruptcy estate.

10. In anticipation of such a sale, the Debtor has drafted an Asset Purchase Agreement to be used in conjunction with the proposed auction and asset sale.  A copy of the Asset Purchase Agreement ("APA"), identified as Exhibit "1" is attached hereto and incorporated into this motion in its entirety.

11. Pursuant to the APA, the Debtor proposes to offer its assets in conjunction with the sale of the assets of Prairieland Blessing Properties, LLC.  Contemporaneously with the filing of this Motion, the Debtor is filing a companion Motion to Sell Assets Free and Clear of Liens in the Chapter 11 bankruptcy of Prairieland Blessing Properties, LLC that is pending in this District as case no. 15-00367.  In addition to the Motion to Sell Assets to be filed contemporaneously in the Prairieland Blessing Properties, LLC case, the Debtor shall file a Motion for Joint Administration and Substantive Consolidation of this case and the Chapter 11 case of Prairieland Blessing Properties, LLC.

12. Any bankruptcy estate assets not included for sale in the APA shall remain assets and property of the bankruptcy estate.  The excluded assets include, but are not limited to, 2014 Buick Lacrosse VIN 1G4GE5G3XEF219013, accounts receivable generated through the day before closing, cash, cash equivalents, pre-paid deposits, policies of insurance, tax refund claims, commercial tort claims and breach of contract claims, avoidance actions of the Bankruptcy Estate under Chapter 5 of the Bankruptcy Code and all other causes of action (other than claims to collect accounts receivable and claims for breach of Designated Contract) existing on the Closing Date (as defined by the APA).  In

addition, the assets of the Debtor's affiliate Prairieland Blessing Properties, LLC shall be sold to the same buyer that purchases the assets to be sold by the Debtor.

13. The Debtor filed a Motion for Approval of Bid Procedures on May 15, 2015 (Doc. 89). The Bid Procedures Exhibit sets forth the procedures for qualifying as a bidder for the Debtor's assets along with the procedures for bidding on the Debtor's Assets.  The Bid Procedures also set forth a timeline for proceeding with the marketing, auction, and sale of the Debtor's assets.

14. The Debtor requests that auction of the Debtor's assets be established for June 22, 2015 with a Sale hearing be set immediately after the auction.

15. The Debtor asserts that a successful sale of the Debtor's assets will be in the best interests of the bankruptcy estate and all of its creditors.

16. The Debtor further asserts that a successful bidder will qualify as a good faith purchaser under established law and the Bankruptcy Code.

**Authority for Sale**

17. Pursuant to Section 363(b) and Section 1107(a) of the Bankruptcy Code, a Debtor-in-Possession exercising its powers as a trustee may sell the Debtor's property outside of the ordinary course of business.

18. Likewise, pursuant to Section 363(f), a Debtor-in-Possession may sell the Debtor's property free and clear of liens.

19. "A sale of substantially all of a Debtor's assets other than in the ordinary course of business and without the structure of a Chapter 11 Disclosure Statement and Plan is not prohibited by the Bankruptcy Code." *In re Channel One Communications, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (*citing In re Lionel Corp.,* 722 F.2d 1063 (2nd

Cir.1983); *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143 (3rd Cir. 1986)). The proposed sale must be scrutinized by the Court and the proponent bears the burden of demonstrating that there is a "sound business purpose for a sale without a disclosure statement and plan; that there has been accurate and reasonable notice; that the price to be paid is fair and reasonable; and that the sale does not unfairly benefit insiders or the prospective purchasers, or unfairly favor a creditor or class of creditors." *Id.* In short, the Court should grant a motion to sell substantially all of its assets under Section 363(b)(1) if it can "expressly find from the evidence presented before [it] at the hearing a good business reason to grant such an application."

20. In this case, the Debtor has good business reasons for selling all of its assets at an auction outside of the ordinary course of business. In order to maximize its value, the Debtor needs to preserve its ongoing projects and book of business. In order to preserve its business, the Debtor needs to continue performance of its existing contracts and maintain its on time delivery of products If the Debtor is unable to continue performance on its ongoing projects, the Debtor will be unable to collect receivables for the work on the projects. A failure to continue to perform on the ongoing projects may result in the loss of business and backlog. The Debtor lacks the financial resources to preserve its ongoing business, continue its operations, and maintain its staff for sufficient time to effectuate a reorganization. The Debtor has concerns about its ability to maintain its current operations as it is in need of a Laser Cutter that it cannot lease due to the pending Chapter 11 bankruptcy. The sale of the Debtor's assets will result in a buyer purchasing all of the Debtor's affiliate's manufacturing plants and the assumption of the Debtor's contracts that should maximize the going concern value of the Debtor's bankruptcy estate. A

Section 363 sale will permit the buyer to take the assets free and clear of liens and encumbrances, and permit work to proceed on the existing contracts. At the same time, value will be realized for the bankruptcy estate and for the benefit of all creditors.

21. Since the Petition Date, the Debtor, its primary financer, GNB Bank and Moglia Advisors have identified potential purchasers of the Debtor's assets, and reports that there were five entities provided Letters of Intent (LOI's) and several of these potential purchasers are interested in serving as "Stalking Horse" bidders in an asset sale. Moglia Advisors has been able to generate interest in the Debtor's assets.

22. Finally, the inability of the Debtor to lease a laser cutter dictates that time is of the essence for the Debtor to arrange a sale. The Debtor's stock in trade is its ability to produce and fabricate custom metal parts built to its customer's specifications in a timely manner. Should performance be interrupted and orders are not timely produced or customers leave, the value of the Debtor's bankruptcy estate would be greatly diminished.

23. The added time and cost of proceeding with a liquidating plan is not economically feasible for all of the above reasons. The Debtor asserts that an asset sale under Section 363(b)(1) is the best method for maximizing the return to the bankruptcy estate.

WHEREFORE, the Debtor respectfully requests that the Court grant its Motion for Authority to Sell Substantially All of its Assets Free and Clear of Liens pursuant to 11 U.S.C. §§ 363(b)(1) and (f) and grant any such other relief as may be equitable under the circumstances.

Dated this 15th day of May, 2015.

Respectfully submitted,

DAY RETTIG PEIFFER, P.C.

/s/ Joseph A. Peiffer
Joseph A. Peiffer    AT0006160
Ronald C. Martin    AT0005050
PO Box 2877
Cedar Rapids, Iowa   52406-2877
Telephone:  (319) 365-0437
Fax:  (319) 365-5866
E-mail joep@drpjlaw.com
ronm@drpjlaw.com
ATTORNEYS FOR DEBTOR

### CERTIFICATE OF SERVICE

The undersigned hereby certifies under penalty of perjury that a copy of this document was served upon, mailed, or delivered to counsel of record, debtor and other parties of interest listed on the attached sheet not served by the Bankruptcy Court's electronic noticing system in compliance with Bankruptcy Rules 7004 and 9014 on the 15th day of May, 2015.

Signed:  /s/ Laurie Richardson

**15-00365 Notice will be electronically mailed to:**

Dan Childers on behalf of Creditor Phoenix Corporation DBA Phoenix Metals Company
dchilders@elderkinpirnie.com, cgosse@elderkinpirnie.com,cwhite@elderkinpirnie.com

Ronald C. Martin on behalf of Debtor Blessing Industries Prairieland, LLC
ronm@drpjlaw.com, kirsten@drpjlaw.com,rmartin.ecf@gmail.com

Joseph A. Peiffer on behalf of Debtor Blessing Industries Prairieland, LLC
joep@drpjlaw.com, laurie@drpjlaw.com,jpeiffer.ecf@gmail.com

H. Raymond Terpstra, II on behalf of Creditor GNB Bank
RTerpstra@TEWLaw.net, sbriley@tewlaw.net

United States Trustee Daniel M. McDermott
USTPRegion12.CR.ECF@usdoj.gov

**15-00365 These parties will be served by U.S. Mail or e-mail:**

Martin J. McLaughlin
Assistant United States Attorney (IRS)
111 7th Avenue SE, Box 1
Cedar Rapids, IA 52401
marty.mclaughlin@usdoj.gov

John Waters
Collections Section, 3rd Floor
Department of Revenue and Finance
PO Box 10457
Des Moines, IA 50306
john.waters@idrf.state.ia.us

Bill Decker
Decker Acquisition Corp.
22840 262nd St.
Delhi, IA 52223
lakebill@iowatelecom.net

GE Capital Information Technology Solutions, Inc f/d/b/a IKON Financial Services
Bankruptcy Administration
1738 Bass Road
P.O. Box 13708
Macon, GA 31208-3708

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "<u>Agreement</u>") is made and entered into as of the ___ day of _____, 2015, by and between Blessing Industries Prairieland, LLC and Prairieland Blessing Properties, LLC, Iowa limited liability companies ("<u>Sellers</u>"), and _____("<u>Buyer</u>").  Buyer and Sellers may be referred to collectively herein as the "<u>Parties</u>," or individually as a "<u>Party</u>."

## RECITALS

A.    The Sellers' headquarters is located in Fayette, Iowa.  The Sellers own manufacturing plants located in Fayette, Oelwein and Quasqueton, Iowa.  Sellers are in the business of custom metal fabrication (the "Business").

B.    On March 25, 2015, Sellers filed voluntary Chapter 11 bankruptcy petitions in the United States Bankruptcy Court for the Northern District of Iowa (the "<u>Bankruptcy Court</u>") as bankruptcy case nos. 15-00365 and 15-00367 respectively.  Sellers have operated the Business as a debtors-in-possession since filing their cases.

C.    Sellers desire to sell to Buyer, and Buyer (or an entity or entities created by Buyer) desires to purchase from Sellers, substantially all of the assets of Sellers used or usable in the conduct of the Business, except for the Excluded Assets (as defined).

E.    The Acquired Assets (as defined) will be sold pursuant to the terms of this Agreement and an order of the Bankruptcy Court approving such sale under Sections 105, 363 and 365 of the Bankruptcy Code (the "<u>Sale Order</u>"). The closing of the sale will be subject to the Sale Order being approved by the Bankruptcy Court under a final.

F.    Buyer is submitting this Agreement to the Sellers, their financial advisor, and their principal secured lender, GNB Bank (the "<u>Bank</u>") under the authority of the Orders entered by the Bankruptcy Court on _____ (the "<u>Bid Orders</u>") setting bidding procedures, dates for making a stalking horse bid, dates for filing objections to the auction and sale of the Sellers' assets, and setting a date for a hearing approving the sale of Sellers' assets. Buyer's execution and delivery of this Agreement and the bid for Sellers' assets that this Agreement represents is conditioned upon the Buyer being designated as the Stalking Horse Bidder, as that term is defined in the Bid Orders.

## AGREEMENTS

**NOW, THEREFORE,** in consideration of the mutual promises herein, and in consideration of the representations, warranties, covenants, and conditions herein contained, the Parties do hereby agree as follows:

1.    **SALE AND PURCHASE OF ASSETS**

1.1    **Acquired Assets**.  Upon the terms and subject to the conditions set forth in this Agreement, including the entry by the Bankruptcy Court of a Sale Order that has become final and non-appealable. Sellers agrees to sell to Buyer, and Buyer agrees to purchase from Sellers, at the Closing (as hereinafter defined), all of Sellers' right, title and interest in and to the Acquired Assets free and clear of all Encumbrances, except as specified below. "Encumbrances" shall include but not be limited to any claim, judgment, lease, sublease, lien, pledge, option, charge, easement, license, security interest, conditional sales agreement, or title retention arrangements which are intended as security, encumbrance or other right of any kind of third parties, whether voluntarily incurred or arising by operation of law, and includes, without limitation, any agreement to give any of the foregoing in the future, any contingent sale or other title retention agreement or lease in the nature thereof, and any "claim", "lien", or "security interest" as those terms are defined in the Bankruptcy Code.  For purposes of this Agreement, "Acquired Assets" shall mean all of the properties, assets, goodwill and rights of the Sellers related to the Business of whatever kind and nature, real or personal, tangible or intangible, that are owned, controlled, leased or licensed by the Sellers, other than the Excluded Assets, whether or not reflected on the books, records or financial statements of the Sellers, or in Sellers' Schedules of Assets and Liabilities filed with the Bankruptcy Court, including, without limitation, the following:

(a)    All Assumed Contracts listed in Exhibit A to this Agreement, as well as all personal property, machinery and equipment (except for personal property, machinery and equipment that are part of the Excluded Assets) whether such assets are located at Sellers' plants in Fayette, IA, Oelwein IA, and Quasqueton, IA;

(b)    All of Sellers' Intellectual Property, including but not limited to, the right to use the name "Blessing Industries," "Blessing," "Quamaco", the Sellers' registered trademarks, if any, and the Sellers' registered logo, if any, (including the registered trademarks and logos listed in Exhibit B to this Agreement); proprietary knowhow, confidential information, publicity and awards received for all projects initiated prior to Closing, as well as Seller's phone numbers, domain names, P.O. Boxes, and webpages;

(c)    All rights in and to all personal property, products or services developed or sold in the operation or conduct of the Business and all rights in and to all raw materials, backlog (included bids that have been awarded to Sellers by customers that have not yet been reduced to a written contract), Work In Process, art work, supplies, packaging and other inventories of the Sellers pertaining to the Business, as well as all other tangible or intangible personal property and interests therein, including all machinery, equipment, vehicles, and furniture of the Sellers used, held for use or intended to be used in the operation or conduct of the Business;

(d)    All Licenses and Permits of Seller pertaining to the Business;

(e)    All rights of Sellers under the Assumed Contracts, including, without limitation, any right to receive the benefit of all obligations due to the Sellers thereunder, and the right to receive payment for goods and services due to the Sellers thereunder for goods and services that have not

been delivered to purchasers/customers as of the Closing Date and to assert claims and take other rightful actions in respect of breaches, defaults and other violations occurring under any of the Assumed Contracts;

(f)      All data, files, books of account, ledgers, general, financial and accounting records, files, invoices, customers' and suppliers' lists, other distribution lists, billing records, sales and promotional literature, employee records, manuals, customer and supplier correspondence (in all cases, in any form or medium) of the Sellers pertaining to the Business (the "<u>Records</u>");

(g)      All credits, deposits, prepaid expenses, advance payments, security deposits and other items prepaid or deposited by the Sellers; and

(h)      All goodwill generated by or associated with the Business.

1.2   **Excluded Assets**.  All of the assets of Sellers that are not included in the definition of Acquired Assets above shall remain the assets of the bankruptcy estate of Seller and shall not be sold or conveyed hereunder (collectively, the "<u>Excluded Assets</u>").  The Excluded Assets include but are not limited to a 2014 Buick Lacrosse VIN 1G4GE5G3XEF219013, all receivables, cash, cash equivalents, policies of insurance, tax refund claims, commercial tort claims and breach of contract claims, avoidance actions of the Seller under Chapter 5 of the Bankruptcy Code and all other causes of action (other than claims to collect Accounts Receivable and claims for breach of Assumed Contracts). Additionally, the term Excluded Assets shall include those assets listed on <u>Exhibit "C"</u> to this Agreement.

1.3.   **Excluded Liabilities**.  Except for the Assumed Liabilities (as defined), Buyer shall not assume any liability, obligation or loss relating to or arising out of any obligation or liability of the Sellers of any kind, whether fixed, contingent, known or unknown, and whether or not existing as of the Closing Date.

1.4.   **Condition of the Assets**.      Subject only to the representations, warranties, covenants, terms and conditions of this Agreement, Buyer is taking the Acquired Assets on an "AS IS, WHERE IS" basis, without any additional representation or warranty of any kind whatsoever. Except as may be specifically set out in this Agreement, Buyer acknowledges and agrees that it is acquiring the Acquired Assets without any warranty as to the quantity, quality, condition, suitability or fitness of the Acquired Assets for any purpose whatsoever, and Sellers will be under no obligation to undertake any repairs, alterations or, except as may be specifically provided for herein, other work of any kind with respect to any of the Acquired Assets.  Buyer also acknowledges and agrees that it has had an adequate opportunity to make its own determination with respect to the quantity, quality, condition, suitability or fitness of the Acquired Assets for any purpose.

## 2.   **PURCHASE PRICE FOR THE ACQUIRED ASSETS.**

2.1   **Purchase Price**.      In consideration of the sale, transfer and assignment of the Acquired Assets to Buyer, in addition to assuming the Assumed Liabilities, Buyer shall pay to Seller

for the Acquired Assets an aggregate amount equal to _____($_____)
in cash (the "Purchase Price"). The difference between the Purchase Price, as adjusted, and the
Buyer's Good Faith Deposit in the amount of ten percent (10%) of the Purchase Price delivered to
the Sellers' financial advisor, Moglia Advisors, by wire transfer of immediately available funds to be
held in the Escrow Account (as defined).

2.2     **Payment of Purchase Price and Good Faith Deposit**.  The Purchase Price less the
Good Faith Deposit (as defined) shall be paid in cash at Closing into the Escrow Account. Buyer
agrees that if it fails or refuses to close the transactions contemplated by this Agreement (other than
due to Sellers' breach of or failure to perform under this Agreement, or due to termination of this
Agreement by the Buyer under Section 9.1), the Buyer's Good Faith Deposit shall be forfeited;
provided however, if the buyer is not designated as the Stalking Horse Bidder, or if an auction is
held by the Bankruptcy Court as contemplated by the Bid Order, and the Buyer is not the Successful
Bidder, the Good Faith Deposit shall be returned to Buyer within five (5) business days of the
closing by the Escrow Agent. The Buyer will also cure any defaults and provide adequate assurance
of future performance on any acquired executory contract and leases, if any.

2.3     **Deliveries at Closing.**

(a)     At Closing, the Seller(s) shall deliver or cause to be delivered to Buyer the following:

(i)     an assignment agreement executed by the Seller(s) for the Assumed Contracts
(the "Assignment"), in form and substance acceptable to the Buyer in its sole discretion;

(ii)     a bill of sale and assignment (the "Bill of Sale") for the other Acquired
Assets, in form and substance acceptable to the Buyer in its sole discretion;

(iii)     the executed Non-Competition Agreements of Seller(s) and their Controller
and General Manager _____, and _____,respectively, each in a form
acceptable to the Buyer in its sole discretion;

(iv)     Originals of each of the Assumed Contracts and the Licenses and Permits;

(v)     all Consents required under the Assumed Contracts from any third party or
Governmental Authority necessary by the terms of each Assumed Contract to assign each
such Assumed Contract to the Buyer; and

(vi)     Seller shall deliver to Buyer exclusive possession of the Acquired Assets,
including the real estate, as well as such other additional instruments of conveyance as are
necessary in Buyer's sole discretion to convey to Buyer title to the Acquired Assets. Title to
the real estate shall be conveyed by  court officer deed(s).

(b)     At Closing, Buyer will deliver to Sellers' financial advisor to hold under the Escrow
Agreement the following:

(i)      The difference between the Purchase Price and the Good Faith Deposit;

(ii)     The Assignment, duly countersigned by Purchaser;

(iii)    A countersigned copy of each of the the Non-Competition Agreement from the Controller and General Manager of Seller; and,

(iv)    a certificate of the secretary or other officer of buyer attesting to (i) the resolutions adopted by the board of directors of Buyer duly authorizing the execution, delivery and performance of this Agreement and the other transaction documents to which Buyer will be a party and the execution and delivery by Buyer of all instruments and documents contemplated hereby, and (ii) the signatures of the officers or authorized representatives of Buyer who have been authorized on behalf of Buyer to execute and deliver this Agreement and any other agreement executed or to be executed by Buyer in connection herewith.

2.4    **Assignment of Assumed Contracts.**  Sellers agree to assume and assign the Assumed Contracts to Buyer pursuant to a Sale Order from the Bankruptcy Court in form and substance acceptable to the Buyer in its sole discretion, and Buyer agrees to be the assignee of the Assumed Contracts

2.5    **Contracts and Leases that are Not Assumed Contracts**. Buyer shall have no liability for any of Sellers' executory contracts and leases that are not specifically identified by Buyer as Assumed Contracts.

2.6    **Allocation of Purchase Price**.  The Purchase Price shall be allocated among the Acquired Assets in accordance with the provisions of Exhibit "F" attached hereto, which allocation shall be used by each Party for filing federal and state income tax returns.

3.    **LIABILITIES**

3.1    **Assumed Contracts**.  Effective as of the Closing Date, Buyer shall agree to perform in accordance with the terms of the Assumed Contracts that are assigned to Buyer; provided, however, that in no event shall Buyer have any liability, based on, arising out of or resulting from any actual or alleged breach or violation by Sellers of, or non-performance by Sellers under, any Assumed Contract that occurred on or prior to the date of Closing.

3.2    **Liabilities and Obligations Not Assumed**.  Unless specifically assumed under this Agreement, Buyer shall not assume or become obligated to pay, perform or discharge any liabilities or obligations of Sellers or of the Business whatsoever, whether known or unknown, accrued, absolute, contingent or otherwise (collectively, the "Excluded Liabilities").  It is expressly understood and agreed that the Excluded Liabilities shall remain the sole obligation of Sellers.

4.    **CLOSING**

    4.1    **Closing Time and Place**.  The transactions contemplated by this Agreement shall be consummated and closed (the "Closing") on or before June 30, 2015 or, the fifth business day after the Sale Order becomes final , whichever is later, at the offices of Day Rettig Peiffer, P.C., 150 First Ave. NE, Suite 415, Cedar Rapids, IA 52401 at 10:00 a.m. Central Time, or at such other place or time as shall be agreed to by the Parties (the date of the Closing, the "Closing Date").  All documents to be delivered at the Closing and acts to be performed there at shall be deemed to have been taken simultaneously.

    4.2    **Marketable Title**.  At Closing, the Bill of Sale, Assignment, Intellectual Property Agreements, and any other instruments of title delivered by Sellers to Buyer shall transfer to Buyer good and marketable title to the Real Property listed on Schedule A of the Prairieland Blessing Properties, LLC bankruptcy schedules and the other Acquired Assets, free and clear of any and all statutory or consensual security interests, liens, pledges, claims, charges, escrows, Encumbrances, options, rights of first refusal, mortgages, indentures, security agreements, or other agreements relating to or affecting the marketability of the Acquired Assets.

    4.3    **Sellers' Employees**.  The Buyer's obligation to close shall be conditioned upon Sellers providing satisfactory evidence to Buyer that Sellers have terminated all of their employees, effective as of 11:59am on the day immediately before the Closing Date. While Buyer shall have no obligation to hire any employees of Sellers, or to pay or assume any obligations for employee benefits that may have accrued while employees were employed by Sellers, Buyer shall be provided access to all of Sellers' employees between the date of this Agreement and the Closing Date for purposes of determining which of Sellers' employees Buyer wishes to extend an offer of employment or an offer to perform services for the Buyer after Closing on an independent contractor basis.

5.    **REPRESENTATIONS AND WARRANTIES**

    5.1    **Representations and Warranties of Sellers.**

    (a)    **Condition of Assets**. The Assets will be sold "AS IS, WHERE IS" with all faults and without any express or implied representations or warranties whatsoever, including, without limitation, warranties of merchantability, quiet enjoyment or fitness for a particular purpose or as to the title, value or quality of the Assets, except as specifically set forth herein.

    (b)    **Authority Relative to this Agreement.**  This Agreement has been duly and validly authorized, executed and delivered by Sellers on behalf of the Sellers' bankruptcy estate and (assuming this Agreement constitutes valid and binding obligations of Buyer) constitutes a valid and binding obligation of Sellers, enforceable against Sellers in accordance with its terms, subject to the entry of the Sale Order and the other terms and conditions set forth herein.

    (c)    **Title to Assets.**   Each of the Acquired Assets is legally assignable by Sellers. At the Closing, Sellers, on behalf of the bankruptcy estate, will convey, and Buyer will obtain, good and valid title to the Acquired Assets, free and clear of any Encumbrances pursuant to Section 363

and 365 of the Bankruptcy Code, and any other applicable section of the Bankruptcy Code, as set forth more fully in the Sale Order.

     5.2.    **Representations and Warranties of Buyer.**  Buyer represents and warrants to Seller:

     (a)    **Organization and Standing of Buyer.**  Buyer is a company duly organized, validly existing and in good standing under the laws of the State of _____ and has the right, power, and authority and all necessary governmental approvals to own, lease and operate its properties and to carry on its business as it is now being conducted or presently proposed to be conducted.

     (b)    **Power and Authority of Buyer**.  Buyer has the right, power, and authority to enter into this Agreement and the other documents and transactions contemplated hereby.  The execution, delivery and performance of this Agreement and all of the documents in connection herewith by Buyer have been duly and validly authorized, and all requisite action has been taken to make them valid and binding upon Buyer in accordance with their respective terms.  This Agreement and the other documents executed and delivered by Buyer pursuant hereto constitute the legal, valid and binding obligations of Buyer enforceable in accordance with their respective terms, subject only to (i) the Sale Orders becoming final and non-appealable, (ii) the other terms and conditions of this Agreement, and (iii) to insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general principles of equity.

     (c)    **Consents and Approvals.**  No consent, approval, or authorization of, or declaration, filing or registration with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Buyer in connection with its execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby.

     (d)    **No Conflict.**  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby or thereby will violate or conflict with any provision of the organizational documents of Buyer or constitute a breach or default under any contract, instrument, agreement, indenture, license, law, order, regulation or judgment to which Buyer is a party or by which it may be bound or affected.

     (e)    **Buyer's Investigation**.  Buyer has the opportunity to investigate the Acquired Assets and the Business, and Seller has provided all information and responded to all inquiries to the satisfaction of Buyer.  Buyer understands and acknowledges that this Agreement does not include any contingency or condition relating to Buyer's satisfaction with due diligence or similar matters.

     (f)    **No Financing Contingency**.  Buyer has sufficient assets or access to sufficient committed financing to permit it to purchase the Acquired Assets for the Purchase Price.  Buyer understands and acknowledges that this Agreement does not include any contingency or condition relating to financing of the Purchase Price.

     (g)    **Buyer's Continuing Liability for Purchase Price in the Event of Assignment**.

Buyer agrees that if it forms a subsidiary to purchase the assets of Seller that it shall remain obligated to Seller for the full amount of the Purchase Price, as the same may be adjusted from time to time under the provisions of this Agreement.

6.  **COVENANTS.**

6.1.  **Consents and Best Efforts.**  Sellers agree that they will work in good faith to procure prior to the date of Closing each consent required from a customer or other third party to the Assumed Contracts (collectively, the "<u>Consents</u>.")  Each of the parties hereto covenants and agrees, upon the terms and subject to the conditions contained herein, to pursue diligently and in good faith and use all commercially reasonable best efforts to obtain the Consents, and to take, or cause to be taken, all such other actions and to do, or cause to be done, all things necessary or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated hereby, subject to the terms and conditions of this Agreement.

6.2.  **Access.**

(a)     After the Closing, Buyer shall be in possession of all or substantially all of Sellers' Records. Buyer shall cooperate with Sellers and make available to Sellers such documents, books, records or information transferred to Buyer and relating to activities of the Business of the Sellers or any of its subsidiaries (including such records as may be stored in computer databases) prior to the Closing as Sellers may reasonably require after the Closing in connection with the administration of the Chapter 11 cases, any tax determination or contractual obligations to third parties or to defend or prepare for the defense of any claim against the Sellers' bankruptcy estates , or to prosecute or prepare for the prosecution of claims against third parties by Sellers relating to the conduct of the Business by the Sellers or prior to the Closing or in connection with any governmental investigation of the Sellers or any of their affiliates.  Buyer shall make such documents, books, records or information available to Sellers, for a period of two years following the Closing.  During such period, Sellers shall have reasonable access to such books and records for the purpose of completing tax returns, determining or disputing liability for Taxes, or addressing disputes with Governmental Entities, provided that neither party shall be required to make available to the other party any records which in its reasonable opinion would constitute a waiver of the attorney-client privilege.

(b)     For two years following Closing, No Party shall destroy any files or records which are subject to this Section 6.2 without giving reasonable notice to the other party, and providing the other party the opportunity to copy such records at such party's own expense. Following the second anniversary date of Closing, all Records subject to Section 6.2(a) shall be subject to destruction in accordance with Buyer's then existing document destruction policy.

(c)     Provided that the Bankruptcy Court approves a sale to Buyer through entry of an Order Approving Sale, during the period between the date of entry of the Sale Order and the date of Closing, Sellers will provide Buyer full cooperation and access to all of Sellers', offices, employees, books and records, client representatives, and all such other information to which Buyer may reasonably request access for purposes of conducting a transition of the Business to Sellers.

6.3      **Transfer of Information, Technical Assistance and Billing Assistance**.  Buyer shall be responsible for making arrangements to retain following Closing those administrative employees of Sellers that Buyer deems necessary to assist in the transition period following Closing. Sellers are under no obligation to hire replacement administrative employees to provide these transitional services if the employees Sellers have on the date Buyer is designated as the Stalking Horse Bidder chose not to continue employment through the date of Closing.

6.4.      **Bankruptcy Court Approval.**  The Sellers shall promptly seek approval of this Agreement under sections 363, 365 and other applicable sections of the Bankruptcy Code. The Sellers shall use their best efforts to have the Bankruptcy Court enter the Sale Order in a form and substance acceptable to the Buyer in its sole discretion, and to cause the Sale Order to become as soon as practicable a final, non- appealable order of the Bankruptcy Court that has not been stayed, modified, reversed or amended (a "Final Order").

7.      **CONDITIONS PRECEDENT.**

7.1.      **Conditions Precedent to Obligations of Sellers and Buyer**.  The respective obligations of each party to effect the transactions contemplated by this Agreement shall be subject to the Sale Order, in form and substance acceptable to Buyer in its sole discretion, being entered by the Bankruptcy Court, and such Sale Order becoming a Final Order.

7.2.      **Conditions Precedent to Obligation of Sellers.**  The obligation of Sellers to effect the transactions contemplated by this Agreement shall be subject to the  satisfaction or waiver at or prior to the Closing Date of the following additional conditions:  (a) Sale to Buyer is approved without need for auction or Buyer is the Successful Bidder at any required auction; (b) Buyer shall have performed all obligations under this Agreement required to be performed by Buyer at or prior to the Closing Date including, without limitation, delivery of the Purchase Price, as adjusted; (c) the representations and warranties of Buyer contained in this Agreement, shall be true and correct in all material respects as of the Closing Date as if made at and as of such date, except as otherwise contemplated by this Agreement; and (d) the Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall have become a Final Order.

7.3.      **Conditions Precedent to Obligation of Buyer**.  The obligation of Buyer to effect the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following additional conditions, any of such may be waived (in whole or in part) by the Buyer in accordance with Section 9.9 hereof.

(a)      **Representations, Warranties and Covenants.**  All representations and warranties of Sellers contained in this Agreement shall be true and correct as of the date of this Agreement and as of and at the Closing Date, and Sellers shall have performed all agreements and covenants required hereby to be performed by the Sellers prior to or at the Closing Date.

(b)      **Instruments of Conveyance.**  Sellers shall have executed and delivered to Buyer all of the documents contemplated in Section 2.3 above.

(c)    **Entry of Sale Order.**  The Sale Order in form and substance satisfactory to the Buyer shall have been entered by the Bankruptcy Court and shall have become a Final Order. Without limiting the foregoing, the Sale Order shall:

(i) specifically approve this Agreement as amended if an auction results in a higher price and all of its terms and conditions and authorize the Seller to consummate the transactions contemplated by this Agreement;

(ii) include a finding that Buyer is a good faith purchaser entitled to the protections of Section 363(m) and Section 365 of the Bankruptcy Code, with the Buyer bearing the responsibility of proffering the evidence necessary for the Bankruptcy Court to make such a finding;

(iii) order that the Buyer is obtaining the Acquired Assets free and clear of all Encumbrances; and,

(iv) provide that the transactions contemplated hereunder shall not be avoidable under Section 363(n) of the Bankruptcy Code.

(d)    **No Lift of Stay Order.**    Prior to Closing, the Bankruptcy Court shall not have lifted the automatic stay under Section 362 of the Bankruptcy Code with regard to any Acquired Asset.

(e)    **Employees of Sellers.**    Sellers shall not have dismissed any of its employees without the written consent of Buyer; provided that Buyer will not unreasonably withhold its consent to the termination of employees prior to Closing that Sellers represent are no longer needed for the efficient operation of the Business, or whom the Sellers wish to terminate for cause.

(f)    **Cash Collateral.**    Prior to Closing, Sellers shall have received from the Court approval to continue to use the Bank's cash collateral, and Debtor-in-Possession financing in sufficient amounts, as determined in Buyer's reasonable discretion, to continue to operate the Business at a level sufficient to maintain the goodwill of the Business.

(g)    **No Terminations or Suspensions of Work Regarding Assumed Contracts**.  Prior to Closing, no client of Sellers who is a party to an Assumed Contract shall have notified the Sellers that the client is either terminating or suspending work under any Assumed Contract.

(h)    **Escrow Account.**    Prior to Closing, the Buyer, the Sellers, and the Escrow Agent shall have entered into a mutually agreeable Escrow Agreement (the "Escrow Agreement") that provides for the distribution to the Sellers immediately following Closing the Good Faith Deposit.

## 8.    **BINDING NATURE OF AGREEMENT**.

Subject to its term and conditions, this Agreement shall be binding upon the Parties upon the Sale Order becoming a Final Order.

## 9.    **GENERAL PROVISIONS**.

9.1    **Termination.**    In the event that Closing of this Agreement does not occur by no later

than 5:00pm Central Time on [ _____,] 2015, and that the failure of Closing to occur is not due to any breach of this Agreement by the Buyer, or any failure to perform under this Agreement by the Buyer, the Buyer shall have the option to terminate this Agreement by delivering written notice of termination under this Section 9.1 to the Sellers and to the Bank. In the event of termination of this Agreement under this Section 9.1 the Buyer shall be entitled to a return of all amounts on deposit in the Escrow Account, including the Buyer's tem percent (10%) Good Faith Deposit.

9.2.   **Taxes**.   Neither Sellers nor Buyer shall be responsible to the other party for any federal, state, county or municipality taxes, imposed upon them or their assets by reason of the sale, transfer, assignment, conveyance and delivery of the Acquired Assets provided hereunder.

9.3.   **Notices**.   All notices, demands, and other communications hereunder shall be in writing and shall be deemed given upon (a) confirmed delivery by a standard overnight carrier or when delivered by hand, or (b) the expiration of five (5) business days after the date when mailed by registered or certified mail (postage prepaid, return receipt requested), addressed to the respective parties at the following addresses (or such other address for a party as shall be specified by like notice):

If to Seller, to:

Kayleen Schott
Chief Financial Officer
500 Wadena Road
PO Box 640
Fayette, IA 52142
Phone: (563) 425-4441
Fax: (563) 425-3388
kayleens@blessingind.com

With a copy to:

Day Rettig Peiffer, P.C.
PO Box 2877
Cedar Rapids, IA 52406-2877
Phone: (319) 365-0437
Fax: (319) 365-5866
ATTN: Joseph A. Peiffer,
E-mail: joep@drpjlaw.com

With a copy to:

Alex Moglia
Moglia Advisors
1325 Remington Road, Suite H

Schaumburg, IL 60173
(847) 884-8282
Fax (847) 884-1188
E-mail: amoglia@mogliaadvisors.com

With a copy to:

Ray Terpstra
Terpstra & Epping
3600 1ˢᵗ Ave. N.E. Suite 101
Cedar Rapids, Ia. 52402

If to Buyer, to:


With a copy to:


      9.4.    **Descriptive Headings**.  The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

      9.5.    **Entire Agreement, Assignment**.  This Agreement (including the Exhibits and the other documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, among the parties or any of them, with respect to the subject matter hereof, including, without limitation, any transaction between or among the parties hereto.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of law or otherwise) without the prior written content of the other party.  This Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns.

      9.6.    **Governing Law; Consent to Jurisdiction**.  This Agreement shall be construed and interpreted according to the laws of the State of Iowa**,** without regard to the conflicts of law rules thereof.  Each of the parties hereto, in respect of itself and its properties, agrees to be subject to (and hereby irrevocably submits to) the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of Iowa, in respect of any suit, action or proceeding arising out of or relating to this Agreement or the transactions contemplated herein, and irrevocably agrees that all claims in respect of any such suit, action or proceeding shall be heard and determined in the Bankruptcy Court.  Each of the parties hereto irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection to the laying of the venue of any such suit, action or proceeding brought in said court and any claim that any such suit, action or proceeding brought in said court has been brought in an inconvenient forum.

      9.7.    **Expenses**.  Whether or not the transactions contemplated by this Agreement are

consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such expenses. Subject to the provisions of Section 9.15, the foregoing shall not affect the legal right, if any, that any party hereto may have to recover expenses from any other party that breaches its obligations hereunder.

9.8.    **Amendment**.  This Agreement may not be amended except by an instrument in writing signed on behalf of all the parties hereto.

9.9.    **Waiver**.  At any time prior to the Closing Date, the parties hereto may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto, and (c) waive compliance with any of the agreements or conditions contained herein.  Any agreement on the part of a party hereto to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such party.

9.10.    **Counterparts; Effectiveness**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same agreement.  This Agreement shall become effective when each party hereto or their counsel shall have received counterparts thereof signed by the other parties hereto.

9.11.    **Severability; Validity; Parties in Interest**.  If any provision of this Agreement or the application thereof to any person or circumstance is held invalid or unenforceable, the remainder of this Agreement, and the application of such provision to other persons or circumstances, shall not be affected thereto, and to such end, the provisions of this Agreement are agreed to be severable. Nothing in this Agreement, express or implied, is intended to confer upon any person not a party to this Agreement any rights or remedies of any nature whatsoever under or by reason of this Agreement.

9.12.    **Bulk Sales**.  Buyer hereby waives compliance with any bulk sales or other similar laws in any applicable jurisdiction in respect of the transactions contemplated by this Agreement.

9.13.    **Attorneys' Fees.**  In any action at law or in equity to enforce any of the provisions or rights under this Agreement, the parties shall be responsible for their own attorney fees.

9.14.    **Interpretation of Agreement.**  The parties hereto acknowledge and agree that this Agreement has been negotiated at arm's length and between parties equally sophisticated and knowledgeable in the matters dealt with in this Agreement. Accordingly, any rule of law or legal decision that would require interpretation of any ambiguities in this Agreement against the party that has drafted it is not applicable and is waived. The provisions of this Agreement shall be interpreted in a reasonable manner to give effect to the intent of the parties as set forth in this Agreement.

9.15.    **Liquidated Damages**.  In the event the Buyer fails to consummate the purchase as a result of a voluntary, willful, and unwarranted breach of this Agreement by the Buyer, the Good Faith Deposit will be non-refundable and shall constitute liquidated damages to the Sellers for Buyer's breach of this Agreement.  However, if this Agreement is not consummated for any other

reason than that described above (i.e., breach by the Sellers, non-compliance with a condition precedent to Closing, or the failure of the Bankruptcy Court to approve this Agreement for any reason, or termination of this Agreement by the Buyer under Section 9.1), the Good Faith Deposit will be fully refunded to Buyer within five business days of the date Buyer notifies Sellers and the Escrow Agent of the grounds upon which Buyer is entitled to a return of its Good Faith Deposit, which notice shall be delivered pursuant to Section 9.2, above. Buyer's liability to the Sellers or to any alleged third party beneficiary of the Sellers for any failure of Buyer to perform under this Agreement shall be limited to the amount of the Good Faith Deposit.

9.16    **CREDIT BID.** Buyer acknowledges that GNB Bank has the right to credit bid all or any portion of its debt prior to or at the time of the auction if it perceives that the winning bid amount is inadequate from the Bank's perspective. Decker Acquisitions which has a junior lien on the assets is also entitled to credit bid its claim subject to satisfying the claim of the Bank.

**IN WITNESS WHEREOF**, Seller and Buyer have caused this Agreement to be executed on their behalf by its officers thereunto duly authorized, as of the date first above written.

BUYER

_____

By:

SELLERS

BLESSING INDUSTRIES PRAIRIELAND, LLC

By: _____
        Kayleen Schott, Chief Financial Officer

PRAIRIELAND BLESSING PROPERTIES, LLC

By: _____
        Kayleen Schott, Chief Financial Officer

List of Attached Exhibits

Exhibit          Description of Exhibits

A        Assumed Contracts

B        Registered Intellectual Property

C        Additional Excluded Assets

D        Accounts Receivable

E        Awards of Jobs That Have Not Yet Been Reduced to Written Contracts

F        Allocation of Purchase Price